## Lee R. Meyer v. Erika Meyer

[789 A.2d 921]

No. 00-420

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed November 9, 2001
Motion for Reargument Denied December 21, 2001

*Jack Long* of *Clark Long & Werner*, Burlington, and *Carolyn R. Wah*, Associate General Counsel, Watchtower Bible and Tract Society of New York, Patterson, New York, for Plaintiff-Appellant.

*Nicholas E. Tishler (Of Counsel)* of *Schoenberg & Associates*, Burlington, for Defendant-Appellee.

**Morse, J.** Father appeals from an order of the family court granting mother's motion to modify the parties' original divorce decree regarding the allocation of parental rights and responsibilities for their two daughters. He argues that (1) mother failed to meet the jurisdictional threshold of demonstrating changed circumstances, (2) the court's order and its consideration of his religious beliefs are unconstitutional, and (3) the court abused its discretion by failing to appoint a guardian ad litem for the girls. We affirm.

Father and mother have two daughters together, Hannah and Hillary. At the time of their divorce in April 1995, father and mother stipulated to joint parental rights and responsibilities for the girls. In June 1999, mother moved to modify the parties' original divorce decree, seeking both sole legal and sole physical rights and responsibilities for the children. Following an eleven-day hearing, the family court granted her motion to modify, ordering that mother have sole rights and responsibilities. Father appeals to this Court.

## I.

Father first argues that mother failed to demonstrate a real, substantial and unanticipated change in circumstances as required by 15 V.S.A. § 668 for modification. Specifically, he argues that the parties have consistently disagreed about major issues concerning the girls since the time of divorce, and that he and mother have never been able to communicate effectively. Thus, he argues under our holding in *Gates v. Gates* mother failed to meet the jurisdictional threshold for modification. Cf. *Gates v. Gates*, 168 Vt. 64, 68-69, 716 A.2d 794, 797-98 (1998) (finding no abuse of discretion by trial court in concluding that *continued* antagonism between parties on issues concerning the children was not a change in circumstances).

We emphasize that the standard of review regarding a trial court's finding of changed circumstances is a deferential one. The trial court's determination is a matter of discretion. *Lane v. Schenck*, 158 Vt. 489, 494, 614 A.2d 786, 788 (1992). Thus, we will not disturb the court's determination unless its exercise of discretion was on grounds or for reasons clearly untenable, or the exercise of discretion was to a clearly unreasonable extent. *Gates*, 168 Vt. at 67-68, 716 A.2d at 797.

Our review of the record reveals that this case is easily distinguishable from *Gates*. First, both mother and father testified that they disagree on just about every major issue concerning the children, including religion, education, extra-curricular activities, whether the children should be participating in counseling and with whom, childcare, and how mother and father should be communicating about the children. Cf. *id.* (noting that parties had been able to effectively cooperate on several major issues, including religious, educational and medical matters, despite disagreement on others). Second, mother's testimony chronicled a significant change in the parties' dealings with one another, notwithstanding father's conclusory testimony to the contrary. Mother testified to extensive cooperation on issues regarding Hannah and Hillary immediately following the divorce, including shared access to one another's homes, the exchange and transport of the children's belongings between the two homes, frequent and open communication between mother and father without limitation, joint parent-teacher meetings, and flexibility about time and contact with each parent. Her testimony then outlined a significant change for the worse in these areas starting in the latter half of 1996, including father prohibiting

the girls from contacting mother while they were in his care, prohibiting mother from entering his home, and refusing to communicate with mother except in writing. Father also requested separate parent-teacher meetings — on one occasion specifically asking the school not to invite mother to a meeting he had arranged with the school principal, Hannah's teacher and Hannah's guidance counselor — and insisted that the children have separate and duplicate possessions for each household. Finally, the trial court based its finding of changed circumstances in part on the effect of the parties' disagreements on the children, particularly Hannah. Even if the parties had anticipated disagreeing continually as father contends, the effect of this on the children was not necessarily anticipated. Given this state of the record, the family court did not abuse its discretion by concluding that mother had sufficiently demonstrated a real, substantial and unanticipated change in circumstances justifying modification.

## II.

Father next argues that the portion of the court's order providing that he not bring Hannah and Hillary to any Jehovah's Witness religious gatherings or attempt to raise the girls as Jehovah's Witnesses is unconstitutional. He further argues that any consideration by the trial court in this case of his religious beliefs was in violation of the both the Vermont and United States constitutions. Because father never argued that mother's request for such a provision in the court's final order was unconstitutional, nor objected to the introduction of evidence on his religious beliefs and practices on constitutional grounds, our review on appeal is limited. See *Varnum v. Varnum*, 155 Vt. 376, 383, 586 A.2d 1107, 1111 (1990) (stating standard of review for unpreserved constitutional claim in a custody case). We will reverse the family court's order in such circumstances only if there exists a "fundamental miscarriage of justice that we cannot overlook." *Id.* We cannot say that there has been one in this case for several reasons.

First, consideration of father's religion by the trial court was not unconstitutional per se. As we noted in *Varnum*, courts may take into account a parent's religious practices when making a custodial determination if there is evidence that the practices have a direct and negative impact on a child's physical or mental health. *Id.* at 384, 586 A.2d at 1111; see also *Jakab v. Jakab*, 163 Vt. 575, 583, 664 A.2d 261,

265-66 (1995). Mother presented extensive evidence that the conflicting practices and rules in each household that stemmed from her and father's disparate religious beliefs were causing Hannah and Hillary to experience extreme confusion and anxiety. For instance, Hannah's teachers testified to Hannah's struggle over participation in birthday and holiday activities at school, a practice that father's religion, that of the Jehovah's Witnesses, prohibits, but a practice that mother encouraged. Hannah's third grade teacher testified to an incident in which father came to the school one day to discuss Hannah's participation in such activities, indicating that he did not want Hannah participating and that the teacher should inform him if she was. The teacher went on to describe how Hannah confronted her the next day extremely upset, and told her that she had made the situation for Hannah worse, asking "why did you tell him?" (about Hannah occasionally participating). One of Hillary's teachers testified that Hillary also appeared to struggle with the decision of whether to participate in birthday and holiday activities as well, but it was mostly confined to the beginning of the school year.

Mother also testified to symptoms of anxiety in both girls — Hannah experiencing nightmares, stomach aches, and a constricted throat; Hillary being very clingy and sucking her thumb. Hannah's pediatrician had ruled out organic causes for her physical symptoms after seeing her on two occasions, and indicated in her testimony that she thought the symptoms had been caused by anxiety. She stated that she recommended counseling to mother for Hannah. The counselor who had been seeing Hannah at mother's request — prior to her termination by father — testified that she considered Hannah to be suffering from anxiety and attributed it to Hannah's conflicted situation, including the conflict of mother and father's religious beliefs and practices.

Based on this and other evidence, the court made specific findings regarding the negative effects on the children of mother's and father's differing sets of beliefs, including the children's feelings of disloyalty, guilt, confusion, and anxiety. Thus, not only was evidence of harm presented, but the trial court made specific findings that the conflicting beliefs and practices in each household were having a palpable negative impact on the children, and would continue to do so. Cf. *Varnum*, 155 Vt. at 385, 586 A.2d at 1112 (noting trial court made no findings regarding the impact of parent's religious practices

on child, but nevertheless concluding court's order was not a fundamental miscarriage of justice).

Second, there was extensive evidence of father attempting to alienate Hannah and Hillary from mother that independently supports the court's disposition in this case. Without chronicling it at length, there was evidence from mother that father refused to communicate with her in person on repeated occasions in front of the children, including incidents of father refusing to answer the door for her, refusing to roll down the car window while she attempted to talk to father at an exchange of the children, communicating to her through stepmother while he stood by silently during exchanges, and hanging up the phone on her. Father also prohibited the children from communicating with mother while they were in his care. Several other witnesses also testified to father's attitude toward mother — one of Hannah's teachers stated that in a meeting she had with father and stepmother at the beginning of the school year, father painted mother in a negative light, and Hannah's counselor indicated that father expressed to her his desire that mother not be part of his family life at all, that he did not consider her part of his family system.

Father himself had indicated in a letter that he did not want any contact between mother and the children when they were with him because he found it "disruptive." When asked why he would not honor mother's request that the girls not call stepmother "mommy," father responded that he did not consider her request "justified" and thought it was merely the result of "jealousy." Such actions and efforts on the part of father not only prevented the parties from effectively co-parenting — necessitating the modification of that arrangement at issue in this appeal — but also weighed against making father the sole custodian for the children. See 15 V.S.A. § 665(b)(5) (in determining best interests of child court shall consider, among other things, the ability and disposition of each parent to foster a continuing relationship with the other parent). The religious issues aside, the evidence at trial painted a stark picture of attempts at parental alienation.

 Third, regarding the provision that father not involve the children in his religious observances or raise the children as Witnesses, the court was merely making explicit mother's decision as the custodial parent charged with legal responsibility for the children. See *Jakab*, 163 Vt. at 583, 664 A.2d at 266 (decision

regarding children's religious upbringing belongs to the custodial parent). Mother specifically requested that such a provision be included in the order in the event she was granted legal rights and responsibilities for the girls. Therefore, the court was not in the position of picking a religion for the children, but was only giving effect to mother's decision on that issue. Nor does the provision prevent father from exercising his religion on his own — in fact the court structured the visitation to avoid conflicts between father's religious meetings and his time with the girls. Considered in light of the evidence of harm discussed above, the provision is not inconsistent with constitutional principles. See *LeDoux v. LeDoux*, 452 N.W.2d 1, 5-6 (Neb. 1990) (court could, consistent with constitution, prohibit noncustodial parent from exposing child to religion at odds with that chosen for child by custodial parent, given evidence and finding of harm stemming from the conflict); see also *Lange v. Lange*, 502 N.W.2d 143, 148-49 (Wis. Ct. App. 1993) (even absent showing of harm, court may constitutionally enjoin noncustodial parent from inculcating children in particular religion when it subverts custodial parent's right to choose children's religion), *cert. denied*, 511 U.S. 1025 (1994). Therefore, there has been no fundamental miscarriage of justice requiring us to reverse the order of the family court.

## III.

██ Father's final argument on appeal is that the trial court erred by failing to appoint a guardian ad litem for the girls under 15 V.S.A. § 669 and V.R.F.P. 7; therefore, we should reverse and remand for a new.hearing. We have noted previously the role of a guardian ad litem at a merits hearing "is limited." *Gilbert v. Gilbert*, 163 Vt. 549, 554, 664 A.2d 239, 241 (1995). As the Reporter's Notes to Rule 7 observe, the guardian ad litem serves primarily to protect and advise the children in the course of the adversarial proceedings, but is not there to supplant the adversarial decision-making process of a contested merits hearing. Reporter's Notes, V.R.F.P. 7. Father points to no evidence in this case that either party to this custody proceeding had anything other than the children's best interest in mind in the course of the litigation. Cf. *Putnam v. Putnam*, 166 Vt. 108, 115-16, 689 A.2d 446, 450 (1996) (noting in case where trial court had made a finding of collusion on the part of the parents, father failed to show that guardian did not adequately protect child's

interests such that failure to also appoint an attorney was reversible error). Consequently, we cannot say that the court's failure to appoint a guardian ad litem for Hannah and Hillary was an abuse of discretion or rendered the proceedings so flawed as to require reversal of the family court's disposition.

*Affirmed.*