VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      25-AP-281



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

FEBRUARY TERM,   2026

Danielle Lacroix v. Peter Rysz\*

}
}
}
}
}

APPEALED FROM:

Superior Court, Windham Unit,
Family Division
CASE NO. 163-9-19 Wmdm
Trial Judge: Elizabeth D. Mann

In the above-entitled cause, the Clerk will enter:

Father appeals the family division's order granting mother's motion to modify parent-child contact.  We affirm.

The parties were formerly married and have an eleven-year-old son.  The 2023 divorce order incorporated the court's October 2021 custody order, which awarded mother primary legal and physical rights and responsibilities.  The order established a biweekly parent-child contact schedule under which father was entitled to six of every fourteen overnights with son.

In the October 2021 order, the court found that father was physically abusive toward mother during the marriage.  Son was aware of father's anger toward mother, and this had made son reluctant to show that he cared about and loved mother.  Son demonstrated significant confusion and emotional distress after the parties' separation and declined to spend time with his maternal grandfather, apparently under father's influence.  Father was uncooperative about custody exchanges, failed to respond to mother's messages about son's health or last-minute school schedule changes, and would not tell mother which week he wanted to take for summer vacation with son.  The court noted that father appeared to understand that expressing hostility about mother in son's presence was harmful to son, and "expressed willingness to commit to not engaging in any such conduct."  It stated: "[t]he court takes him at his word, and expects that he will stick to this commitment, and will communicate to others who spend time with [son] that this is the rule that they are all expected to follow."  Although the parties were then unable to share decision-making, the court expressed hope that father's anger and distrust toward mother would dissipate and that parents would be able to communicate civilly for the benefit of son.  The order required both parents to demonstrate civility and respect for the other parent in son's presence.

In October 2024, mother moved to modify parent-child contact. She asserted that there had been a change in circumstances because father had not improved his behavior as expected by the court and continued to denigrate her in front of son. Mother further asserted that father interfered with her decision to enroll son in counseling, refused to give son prescribed medication, allowed son to skip school, and refused to communicate civilly with mother. She asked the court to modify the parent-child contact schedule to limit father's contact to weekends during the school year.

In response, father moved to enforce the requirement that parents share transportation obligations. Father argued that at the time of the divorce order, both parties resided in Dummerston, son attended the Dummerston school, and the specified location for custody exchanges was equidistant from parents' homes. In July 2023, mother moved to Vernon and enrolled son in school there, which increased father's driving time. Father asked the court to designate a different exchange location and to require mother to share equally in transporting son.

The court held a hearing on both motions over two days in April 2025. The court found that father's animosity toward mother remained strong and son was "negatively impacted by the conflict" created by father's feelings. The court found that when mother informed father that she had moved to Vernon, father became very angry because he would have to drive farther. The next day, he called the sheriff's department and reported that mother and her partner were growing over sixty marijuana plants at their new home. A sheriff's deputy visited the property and later reported the incident to the Department for Children and Families (DCF). Mother did not hear further from DCF or the sheriff's department. Father testified that he called the sheriff because son had told him that mother and her partner grew marijuana. The court noted that father did not acknowledge that a better course of action would have been to contact mother to inquire about son's report, or how stressful it would have been for son if he had been present when the deputy arrived at the house or if a full search was conducted.

The court found that son had been diagnosed with ADHD and displayed worsening anger and behavioral issues over the past year. Mother wanted son to participate in counseling but father had "not been fully supportive." Son was convinced that counseling was bad and was unwilling to go. Mother invited father to participate in decision-making related to school and medical issues, but her efforts backfired. Instead of engaging with mother and son's doctor regarding son's ADHD diagnosis, father disclosed the diagnosis to son, who returned from his time with father angry and distrustful of mother.

Father refused to attend son's events if mother was present and would not bring son to events that overlapped with his parenting time, regardless of their importance to son. Son was named to a baseball all-star team that played a game on July 4 every year, but father did not allow son to play. Father also refused to bring son to baseball practice during his weekend time in the fall. Father refused to attend son's end-of-the-year jump-rope show two years in a row, once because it was on a "Mom day" and the second time because he felt mother was exhausting son. The court found that father's anger toward mother continued unabated. His inflexibility had impacted son's ability to fully engage in activities and created uncertainty for son regarding participation in social and sporting events.

The court further found that despite knowing that son was supposed to be with mother during the Christmas 2024 break, father told son in the spring that they would be going on a cruise and scheduled the cruise during mother's holiday time without consulting her. Mother

allowed son to go on the cruise, not wanting to be the "evil parent who denied [son] the cruise opportunity."

Although it could not conclude that son's aggressive behaviors at school were solely caused by father's behavior, the court found that the weekday custody transitions were disruptive to son and should be minimized. The court noted that son was absent from school numerous times when he was in father's care, without a valid excuse.

The court concluded that because father's attitude toward mother and his displays of animosity had not abated as expected by the court in its 2021 order, there had been a real, substantial, and unanticipated change in circumstances justifying modification of the parent-child contact order. The court assessed the factors set forth in 15 V.S.A. § 665 and concluded that parents were equally situated with regard to most of them, except that mother was more able and willing to foster a positive relationship with father. The court therefore altered the contact schedule to give father alternating weekends and half the summer break with son. The court ordered that custody exchanges occur at school on Fridays and otherwise at an agreed-upon location roughly halfway between parents' homes. Father appealed.

When considering a motion to modify a parent-child contact order, the trial court must first determine whether there has been a "real, substantial, and unanticipated change of circumstances." 15 V.S.A. § 668(a). If this requirement is satisfied, then the court must consider whether modification of the existing order is in the child's best interests according to the statutory factors. Id.; see 15 V.S.A. § 665(b) (listing best-interests factors court must consider). "Decisions regarding the granting, modifying or denying of parent-child contact lie within the discretion of the family court, and we will not reverse the court's decision unless its discretion was exercised upon unfounded considerations or to an extent clearly unreasonable upon the facts presented." DeSantis v. Pegues, 2011 VT 114, ¶ 26, 190 Vt. 457 (quotation omitted).

Father first challenges the court's determination that there was a change in circumstances sufficient to justify modifying the existing parent-child contact arrangement. He argues that the parties always had difficulty co-parenting, so the continuation of such difficulties could not constitute a change in circumstances. The trial court's determination of changed circumstances is a matter of discretion, and we will uphold it "unless its exercise of discretion was on grounds or for reasons clearly untenable, or the exercise of discretion was to a clearly unreasonable extent." Meyer v. Meyer, 173 Vt. 195, 197 (2001). "There are no fixed standards to determine what constitutes a substantial change in material circumstances; instead, the court should be guided by a rule of very general application that the welfare and best interests of the children are the primary concern in determining whether the order should be changed." Maurer v. Maurer, 2005 VT 26, ¶ 7, 178 Vt. 489 (mem.) (quotation omitted). The burden of demonstrating changed circumstances regarding a parent-child contact order "is not as high as the heavy burden of showing changed circumstances with respect to a motion seeking a change of custody." Hawkes v. Spence, 2005 VT 57, ¶ 20, 178 Vt. 161 (quotation omitted).

The court acted within its discretion here. The 2021 order indicated that father had long been controlling and uncooperative around coparenting with mother. However, father had expressed a willingness to commit to being respectful and civil about mother in son's presence, and the order anticipated that he would do so going forward. As the court found in its 2025 order, father had not acted in the manner anticipated by the court, which constituted a change in circumstances. See Hoover (Letourneau) v. Hoover, 171 Vt. 256, 258 n.2 (2000) (explaining that "[c]ircumstances or arrangements are 'unanticipated' if they were not expected at the time of

divorce"). The court's decision was based in part on how father's behavior had negatively impacted son, who had displayed worsening anger and behavioral issues. "Even if the parties had anticipated disagreeing continually as father contends, the effect of this on [son] was not necessarily anticipated." Meyer, 173 Vt. at 198. The court also found that father had undermined mother's medical decisionmaking and interfered with scheduled vacation time. We have held that a parent's "willful, repeated interference" with the other parent's rights and responsibilities "may constitute changed circumstances sufficient to justify modification." Weaver v. Weaver, 2018 VT 38, ¶ 18, 207 Vt. 236. Given this record, the court acted within its discretion in finding a change in circumstances sufficient to justify modifying the existing parent-child contact order.

Father claims that the court's order contravenes the public policy expressed by the Legislature in 15 V.S.A. § 650, which states that "it is in the best interests of their minor child to have the opportunity for maximum continuing physical and emotional contact with both parents." He argues that the court acted out of a desire to punish him for his behavior. The record does not support his claim. The court was properly focused on son's best interests. It explained that father's behavior was having a disruptive impact on son's wellbeing and in particular, his behavior and participation at school. Its order reduced father's contact during the school week to minimize transitions that would affect school, but increased father's contact during the summer and maintained the existing holiday schedule. The order gave father ample contact time overall and was not contrary to § 650. See Bancroft v. Bancroft, 154 Vt. 442, 449 (1990) (holding that order giving father visitation rights that amounted to half of children's time on weekends and school vacations, and approximately twenty-five percent of their time overall, did not offend § 650).

We reject father's claim that § 650 required the court to find serious emotional or psychological harm to son before it could alter the parent-child contact schedule. While the court "may not permanently halt all contact between a parent and a child" absent such a showing, Weaver, 2018 VT 38, ¶ 32, the statutory scheme makes clear that the court may modify parent-child contact if it finds that there has been a real, substantial and unanticipated change in circumstances and modification is in the child's best interests. See 15 V.S.A. § 668(a) (stating standard for modification of parent-child contact order); Bancroft, 154 Vt. at 449.

Father also challenges several of the court's findings. First, he argues that there was no evidence to support the court's statements that he could have raised his concern to mother about her alleged marijuana plants before calling the police and that it could have been stressful for son if the sheriff had visited the house, or conducted a search, when son was there. However, these were not truly "findings." Rather, the court was observing that if father was motivated by a desire to protect son, he could have approached the situation in a way that posed less risk of traumatizing son. The court's statements were based on its assessment of the evidence and are not clearly erroneous.

Next, father claims that there was no evidence to support the court's finding that father had "not been fully supportive" of counseling for son. We see no error. Mother and father agreed that father did support son's visits with a male counselor at school. However, mother also testified that father generally felt that counseling was unhelpful. He refused to go to marriage counseling with her. When son began having aggressive behaviors, she wanted additional counseling for son beyond what the school could offer, and the school recommended counseling for son. However, father strongly opposed counseling and son refused to go. Mother asked father to help her find an appropriate counselor but father refused. By the time son began seeing

4

the male counselor, it was unhelpful because son had become so fearful of therapy. Father did not encourage son to open up to other counselors. This record supports the court's finding that father was not fully supportive of son's participation in counseling.

Similarly, the record supports the court's finding that father's animosity toward mother interfered with his ability to make decisions in the best interest of son. Father admits on appeal that he "does continue to feel a certain level of animus toward mother." The record of text messages between the parties since 2022 showed that father often did not respond to mother's requests for information about son or invitations to have father attend school events. After mother informed him that she was moving to Vernon, their communications deteriorated sharply. Father made derogatory remarks about mother and her new partner, accused mother of picking counselors who favored her, and at one point in early 2024, completely stopped responding to mother's texts about son for two months without explanation. Father stated at the hearing that he refused to go to son's activities during mother's time because "I don't need to be. I don't need any more RFAs." He also refused to take son to fall baseball practice because he had signed son up for motocross. While mother could not control what son did during father's time, Barrows v. Easton, 2020 VT 2, ¶ 14, 211 Vt. 354, the record supports the court's finding that son missed many social and sporting events due to father's refusal to cooperate with mother, and that the uncertainty was not in son's best interests. The same record, along with mother's testimony, supports the court's finding that mother invited father to participate in decision-making regarding school and medical issues, without success.

The record also supports the court's finding that weekday household transitions were disruptive to son and should be minimized. Mother testified that son's behaviors escalated at home and school on transition days. Son's school principal testified that son had been referred to the office twenty-two times that year, which was a high number. She had to suspend son twice for aggressive behavior, including putting his hands around another child's neck and taking another child's hat and wrestling him to the ground. On around five occasions, she observed son to be in tears, slumped in his chair, and unwilling to talk about what was bothering him. Son's report cards showed that his school performance had worsened over the past year. While there was no evidence presented of what day of the week or month these incidents occurred, the principal's testimony generally corroborates mother's testimony regarding son's escalating behavior.

We further see no error with the court's statement that son missed numerous days of school while in father's care and that these absences were not explained by illness or another valid explanation. Mother's testimony supports this finding. Father argues that her testimony was insufficient to contradict his testimony that he only kept son out of school if son wasn't feeling well. He makes the same assertion with regard to other findings by the court. However, the existence of conflicting evidence does not make findings clearly erroneous if they are otherwise supported by the record, as is the case here. See Gilbert v. Davis, 144 Vt. 459, 461 (1984) ("The ruling of the court must stand if supported by credible evidence, even though there may be inconsistencies or substantial evidence to the contrary.").

Father argues that the court clearly erred in finding that son had been negatively impacted by father's behavior.[*] We disagree. The court could reasonably infer from mother's testimony

---

[*] Father claims that the court should have called son as a witness or appointed a guardian ad litem and that without doing so, it could not make this finding. Father failed to preserve this claim by requesting such relief below; we therefore do not address this argument. See Bull v.

5

and father's own statements that father's attitude and statements about mother were detrimental to son, as evidenced by son's increasing aggression and anger toward mother, which escalated on days when they exchanged custody. The court had previously made similar findings in its 2021 order. We reject father's claim that expert testimony was required to establish that father's conduct was likely harmful to son. See Renaud v. Renaud, 168 Vt. 306, 309 (1998) ("[T]he great weight of authority holds that conduct by one parent that tends to alienate the child's affections from the other is . . . inimical to the child's welfare."). "In determining the best interests of the children in custody matters, the court may draw upon its own common sense and experience in reaching a reasoned judgment." Gordon v. Fogell, 2025 VT 24, ¶ 7 (quotation omitted).

The court considered the best-interests factors and explained the reasoning for its decision, which is consistent with the child custody statutes. We accordingly do not disturb its decision.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Nancy J. Waples, Associate Justice

Pinkham Eng'g Assocs., 170 Vt. 450, 459 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal.").